v. City of Atlanta May it please the Court? Yes. I am Attorney Valorie Jones representing the City of Atlanta and the individual defendant officers in this case. We have brought this appeal requesting that the Court reverse the District Court's finding of denying qualified immunity to the individual officers and the District Court's finding of municipal liability in this case. Why should we hear the ruling with regards to municipal liability in the interlocutory appeal when the decision on the qualified immunity issues, at least as I see it, are not going to control necessarily the decision on municipal liability? I'll give you, for example, the question of whether or not there is a municipal policy that led to an alleged constitutional violation. That issue doesn't arise at all in the qualified immunity appeals. We have to decide that issue anew if we get to the City's potential liability. So why is there jurisdiction to review that claim? Your Honor, I would submit to you that the issues are inextricably intertwined. The District Court's order speaks to finding liability against the municipality. The District Court used the deposition testimony of the 30B6 witness, which it later determined by sanctioning the City, that that wasn't a proper 30B6 witness and the fact witness Sergeant Burns. That was the testimony of those deposition testimonies that the District Court used in finding liability against the City. So our argument is that those are not . . . But that's not the same testimony that was used to deny qualified immunity to the officers. No, Your Honor, but one of the individual officers, an individually named defendant in this case, was also one of the deposition testimonies that was used against the municipality in determining municipal liability. But that can't be the basis for hearing the City's municipal liability argument that one witness overlapped both in his individual capacity and his 30B6 capacity, right? Well, it's a basis for the same facts and the same law applies . . . It's totally different. It is, Your Honor, but I . . . So what . . . I have a hard time understanding how the testimony of an officer who, for qualified immunity purposes, we lean all the evidence in favor of the plaintiff. We don't make any determination of credibility. Well, there is also . . . It may well be that whatever the evidence is with regard to City liability is looked at entirely differently in the next appeal, as it were. Well, there was also the testimony of the 30B6 witness that the court used as proof of liability or to substantiate them finding liability against the City. And then there was the issue of whether that was, in fact, a properly designated witness. Our position is that the issues are inextricably intertwined. Why don't you get to the qualified immunity? You're going to spend all your time. Thank you, Judge. And if you're more interested in the City liability and not the officers. That was where I was beginning, Judge. I just wanted to be sure I answered your questions. This Court has long since determined that the analysis for determining qualified immunity is once an officer is determined to be acting within the scope of his discretionary authority, the plaintiff must establish, and in this case, the appellee must establish that the defendant's conduct violated a constitutional right and the right was clearly established. Our position is that the right was not clearly established in this case, Your Honor. Both elements of the qualified immunity prong must be met as this Court has found in Grider v. City of Auburn, which is a 2010 11th Circuit case. The Court made no full analysis of the clearly established right prong of the qualified immunity standard and thus we feel that the case should be reversed or the findings should be reversed. The defendants did not have any fair warning in this case that their conduct was unlawful. In fact, it was the opposite. They believed that they were doing exactly what they were supposed to be doing. Pursuant to what? The Constitution or their own policies? Pursuant to the ordinances of the City of Atlanta, which the City of Atlanta has a license and permitting division. There are qualified law enforcement officers, post-certified law enforcement officers that work in that unit and their purpose is to enforce the City's license and permitting laws. But they also have to obey the Fourth Amendment. Well, Your Honor, even if this Court finds that there is... Do you agree with that? Do you agree they had a Fourth Amendment right at 4 o'clock in the morning? We do believe that they did have a Fourth Amendment right, but even if... So they entered without a warrant at 4 o'clock in the morning? Well, Your Honor, even if you find that there is a Fourth Amendment violation... But there was a warrantless entry. It was a warrantless entry, yes, Your Honor. It was a warrantless entry. But even if you find that this administrative inspection or this entry into this premises does violate the Fourth Amendment, there's still the second prong to the qualified immunity analysis that has to be met. This Court has determined that both elements of the qualified immunity prong must be met before there can be a denial of qualified immunity and that's in Grider v. City of Auburn. This law is not clearly established or else I don't think that we'd be here right now, honestly. Well, what do you think was established, if anything, at the time the officers went in without a warrant? I think that it was established that the officers reasonably believed that they had a right to investigate this situation. No, that's a factual determination. I'm asking you in terms of pure Fourth Amendment law, what, if anything, do you think was clearly established at the time the officers went in without a warrant? Nothing. Nothing? Nothing. Marshall v. Barlows didn't set out anything? Well, Your Honor, the difference... I understand an argument that it didn't provide enough specificity to give these officers warning. I understand that argument, but I don't understand the argument that there was nothing out there that told the officers what they could and couldn't do. No, Your Honor, the difference in Marshall and the situation in this case, the government inspectors in Marshall were inspecting an electrical and plumbing installation business. The premises in Marshall was that whether the government inspector could inspect a non-public area of a private business without a warrant. This case is about entry into the business without a warrant. I submit to you... That's the same thing. I submit to you that those are two different issues. What did these officers go in to do, inspect, right? Well, they were actually going to determine what, if anything, was going on in this business past the hours of operation that are allowed by the city ordinance. Call it inspection, call it investigation. That's what they were trying to do, right? They were trying to investigate, yes. But there's no establishment that there was... So, police officer, you think that is... You think at the time these officers went in, there was no law that told them one way or the other whether they could go in, abstigent, exigent circumstances, into a commercial establishment without a warrant? Your Honor, I would direct you to Fortinson v. City of Albertson, which this court decided in 2014. I believe, Your Honors, Joe Flatt and Jordan were as a part of that finding in that case. In that case, there was an owner of a rental property that rented out its property for parties, and the officers had received noise complaints about noise and loud music emanating from this commercially leased establishment. The district court granted the motion for summary judgment on qualified immunity and found no municipal liability. The 11th Circuit affirmed that case because they found that it was not sufficiently clear that a reasonable officer would understand that what he was doing violated any right. It was not sufficiently clear based on the city's ordinances that allows for regulation of these types of establishments. This was a commercially zoned area. They were out inspecting other businesses and happened upon Mr. Brown's Motorcycle Club. They heard the loud music coming from it. They weren't supposed to just walk away because their job is to diligently inspect and search. You can't go in to any place without a warrant just because you think something improper is going on? Well, this is not any place, Your Honor. This is a commercially zoned location. Let's limit it to a commercial establishment. You're telling me that it is permissible under the Fourth Amendment. Forget about clearly established now. Let's talk just about general Fourth Amendment principles. You think that if police officers happen upon a commercial establishment, let's say a restaurant, and the restaurant is playing music at a time when it's not supposed to be playing music, and the restaurant has its doors locked for its patrons' privacy, the officers can go in without a warrant to deal with the music issue? I think the difference in the hypothetical that you're giving to me in this situation is that the doors were not locked. Okay. I'll give it to you. Doors were not locked in my hypothetical. They can go in without a warrant? And this was also after hours of operations according to the city's ordinances. I'll give you all of those facts. This is a restaurant that's supposed to operate until midnight, and my restaurant is operating at 1230 in the morning, and its doors are closed but not locked. The officers can go in without a warrant to deal with the music issue? Or whatever issue they feel like may be going on in there that may be a violation of the code. Yes, Your Honor. I would submit to you that. However, I would also want to continue to remind this Court that even if there is a hypothetical, and there can be different situations, and that's a finding of fact. I understand what the Court has said thus far, but it wasn't a clearly established right. These officers were not, it's obviously a gray area or else we wouldn't be here talking about it. The argument is that they had an implied invitation to enter the premises. Or that they had an implied authority to enter the premises. No, an invitation under the law by the proprietors to come on in without a warrant. I don't know that I would use the word invitation, Your Honor. Analytically, that's what you're talking about. Essentially, yes. They had an implied invitation to go in there. Yes, Your Honor. Based on the facts and the totality of the circumstances that were facing them at that time. Your Honor, it means that anybody making racket at 4 o'clock in the morning is inviting the police to come in without a warrant. That's your argument. If you're in a commercially zoned location, yes. In a commercial place, making noise, and that's an implied invitation to enter, is your argument. I think in this case. Do you have a case for that proposition? No, Your Honor, but I do have a case that says that the officers are not obligated to be creative and imaginative in deciding cases. Wait a minute. Wait a minute. If there's no invitation, they can't go in. It doesn't have anything to do with invitation, Your Honor. The fourth amendment. Your argument is that the law, in effect, establishes the invitation. What I'm saying is that. Because they. Just listen to me. They're in a commercial area, and your argument analytically is that because of the ordinances in the city of Atlanta, people in that situation are impliedly inviting the police to come in without a warrant. If they're open too long, or they're making some noise, or whatever it is. For closely regulated businesses that are authorized to be regulated under the city of Atlanta's ordinances. If it pleases the court. I think you've saved some rebuttal time. Oh, yes. Yes, Your Honor. Mr. Bradley. Isn't that just about what the argument is? That the city structure of the city ordinances, that there's an implied invitation to enter on certain conditions. I don't even know that that's their argument. That's normally what regulatory law is. I think that's. That's a part. Just listen to me. Yes, sir. The entity being regulated by the government, in effect, invites you to come in to inspect. That's a good way to look at it. It's just like a defendant under probation invites the probation officer to come in. Yes, Your Honor. So when there's a. That's basically what they're talking about, isn't it? So that's a good way to look at the administrative inspections exception to the Fourth Amendment. That essentially, when there's a licensure scheme, that there is a privilege that a business gains from being a part of that. Because usually the license, the scheme says, when can we come? Yes, correct. And under what circumstances can we come? That's exactly right. And so if you want to do business under those circumstances, it's an implied invitation. That's exactly right, Your Honor. As long as they're dotting the i's and crossing the t's. Correct. So when a certain closely regulated businesses, such as, there's been, the Supreme Court's Well, you can probably name it. These cases come up piecemeal. Yes, sir, Your Honor. Yes, sir. And essentially, that is one explanation for why a warrantless inspection is available for these types of businesses, is because the government gives you the privilege to do this business. If in exchange, you agree that. So you're, in effect, inviting them in. Correct. That's right. That's right. So let me. I'm not saying that it's not, the fourth amendment still applies. Yes, sir. Yes, sir. And the issue in this case is, there was, Mr. Brown had never entered into that bargain with the city. And the city, because he was not running any sort of business, he was not selling alcohol to the public, certainly. The problem is that the city, in contravention to the way the Supreme Court and this Court has narrowly defined the administrative inspections, exception to the fourth amendment. The city offered direct evidence that its policy is that any premises that is in a commercial zone district, or even a premises that is outside of a commercial zone district, but which officers suspect is conducting business, is subject to be, to warrantless entry and inspection. And that policy that the city has defined runs in a 180 degree different direction than the clearly established law by this Court and the U.S. Supreme Court, which establishes clearly. And the question you had asked to my co-counsel was, what was the law clearly established as to with respect to this issue? And the law is clearly established under the fourth amendment that the owner of a property, including a commercial property, has a right to be free from a warrantless inspection or search of his or her premises, subject to a number of narrow, clearly defined exceptions to the fourth amendment. And in the absence of one of those exceptions, which the party asserting that exception has the burden to prove. We understand that. And the exception here that is relevant is the administrative inspection exception. Correct, Your Honor. And let me pose to you why I think that perhaps you should have lost this case and the district court should be reversed. It seems to me we look at the situation, we look at what the officers reasonably perceived as they approached. And as they approached, they saw automobiles in the parking lot at 4 o'clock in the morning. They saw, they know that this was a commercial zone, an area where a lot of nightclubs, alcohol establishments were located. They hear loud noise coming from the inside. The windows are blackened. It seems to me reasonably appears to these officers that a nightclub is operating inside. If it reasonably appears to the officers that a nightclub is being operated inside, it should have been licensed, whether it was or not is irrelevant to what these officers knew at that time. Therefore, it seems to me they were authorized, implied invitation to enter when the business is open, sounded like the business was open to them. So they try the door and the door is unlocked. The public is welcome. There's no bouncer at the door. There's nobody else at the door to suggest to them that they should not enter. And they go in and there is adult entertainment and other things. It looks like a nightclub operating. Now, why would not the officers reasonably think that the administrative inspection exception applies? And if it does, in other words, unless it's clearly established that it does not, then you lose. I understand that argument, Your Honor. I think that the the important thing here is to look at the record in this case and to see what did the officers believe when they came upon the premises and why did they make the decision to go in? And the testimony by the officer who led the search was that he had no idea what was going on in that premises. All he knew was that there was music coming from it and there were cars parked out front. I think the test is what reasonably appeared to the officer, not what he subjectively thought. Is that not true? I believe it is, Your Honor. But I think we can look to what is objectively reasonable based on objectively what did he observe? And certainly he observed the music coming from the premises and he observed cars parked out front. And that may be reason to believe there's some sort of commerce going on inside this premises. But the administrative inspection . . . Is it not reason to believe that the business is open? It may be. And the business is open. The city ordinances allow entry . . . Well, not . . . . . . for inspection of regulated industries that are supposed to be licensed. If it is a, if it is a, again, part of one of those narrowly defined . . . So, for example, if I have my law offices . . . . . . written in loud music at 4 o'clock in the morning that doesn't serve alcohol? Well, Your Honor, I would, there's a, something I often think about as I've looked at this case, is there is a Pentecostal church right down the street from where we live . . . Does this music sound like Pentecostal church music? They, they, you know, this, this entity, there is loud music and . . .  Well . . . . . . because they didn't see that until they got in, but that's what happened. Right, they didn't see that until they got in. Seems to me that was reasonable to assume when they were outside with loud music like that. It was not religious music. I disagree with you on that, Your Honor. I think that there are all sorts of human activities that we do that we're allowed to do . . . . . . and we're allowed to do in, in privacy. In a commercial district where a lot of nightclubs are . . . Absolutely. . . . with loud music. It would have helped if, if the music were described, but . . . That's dangerous, Your Honor. . . . if, if the record showed the kind of music that was played, I would bet my bottom dollar it was not Pentecostal religious music. Well, that's, that's dangerous, Your Honor, because we don't want to treat people differently . . . . . . because of what type of music they're listening to, for example. Well, that has to do, that has to do . . . Fourth Amendment rights or not. . . . with a reasonable suspicion of alcohol. I don't know that that's true, Your Honor. I don't know that that's true. I think people, everyone has, every citizen of the United States has the same Fourth Amendment rights . . . . . . and that, that, those rights don't change based on, for example, what type of music they're listening to. So, the officers should just walk away? They, they, they see this kind of operation that reasonably looks like one should have been licensed, should have had an alcohol license . . . . . . and they should walk away? They could have gone and gotten a warrant. That's the problem here, is this was a warrantless entry that was, from its inception, a search. This was not a situation where an officer went into a premises that he believed . . . . . . under the statute, under the ordinances applied here, the business is open. They can walk in and check. No, Your Honor. That's the way I read the ordinances. I read the ordinances that if the business is open, regardless of time, the officers can walk in. Assume that is the ordinance. Well, that's a, I don't want to make that assumption because I, I don't believe that is the ordinance. And, and if that is the ordinance, that is an unconstitutional ordinance. You don't think a business open to the public can, officers can walk in? One of the problems is, is the difference between qualified immunity and whether it's legal or not. It could, it could be an illegal entry. Right. Because it doesn't, it's not covered by the ordinance or whatever it is. They could have misapplied the law. Sure. But that's not the question. The question is whether or not . . . Yes. . . . they had a reason, objective test . . . Right. . . . that they were properly applying it. There are . . . Given all the facts. So what case says that facts like these, it's illegal to walk in? Well, so there's not, this identical case has not come before the court. There are cases such as the Bruce V. Beery case that sets forth the law that would apply to . . . And that's real different, of course . . . It is. . . . with the SWAT team and all. Correct, Your Honor. And this is not a SWAT team case. There are a series of SWAT team cases in which there's no question that the officers had the authority to conduct an administrative inspection. And the question in those cases is whether, once they did that, whether they exceeded the scope of what is allowed for an administrative inspection. Well, that's where they misbehave once they get inside. Correct, Your Honor. This case is about whether there was authority to conduct an administrative inspection to begin with. You had spoken about the licensure scheme and the bargain inherent in that, that once you obtain this license, you are then put on notice of what sort of inspections you might face. That is an objective thing we can look to here to say . . . They know whether a premises is within that licensure scheme, and therefore they know whether this is a premises that can be inspected without a warrant pursuant to the alcohol licensure scheme. This was not such a premises. This is not a business that had entered into that agreement with the city, had not received a license, had never . . . did not represent to the public that they were open for business. Looking behind this whole thing, it was a pretextual entry. Yes, Your Honor. That was my intro, and I wanted to address your questions. No, I mean, yeah, that it was pretextual, but that's a fact issue. Yeah, this whole business of didn't they just enter like a member of the public? Any member of the public could enter, and then they saw some shenanigans going on. The city, in their own brief to this court, has said the reason why they entered the premises was because they, quote, suspected criminal activity. This was a criminal investigation from the inception. This was not a situation where an officer goes into a premises, observes someone committing a crime, and then perhaps arrests that person or, in the case of a search, goes and submits that evidence to a magistrate and then gets a warrant to come back and search. One of the problems is whether that's a fact issue that gets swallowed up. Well, and also subjective intent is not relevant. No. Well, it is relevant, I believe, because we have to look at . . . It could be relevant in the end of the day. I believe it's relevant . . . There's not any question about it. If the case went to trial, it's all relevant. I believe it's relevant to qualified immunity because if this were a situation where the officer said, we just thought it was open for business, we were going in just like any member of the public, and then we saw something that gave us cause to believe it was a search, I think that would be a better argument for qualified immunity. But because they went with the intention, from its inception, the crossing of the threshold into this premises was motivated by the desire to conduct a criminal investigation. And this Court's clearly established law says that the administrative inspection's exception may not and cannot be used as a pretext for criminal investigation. And they are on the record saying that was their motive, in fact, was to . . . You think there's no dispute about that? That's in their briefing to this Court. I almost feel like they misunderstand the law. So you're arguing that that's a party's admission? Yes, it is, and it's in their briefing to this Court, Your Honor, yes. The subjective intention behind the officers in entering this premises was not to go in as a member of the public might, in other words, to accept an invitation, but was to conduct a criminal investigation. And that is completely antithetical to the Fourth Amendment. We understand that would violate the Fourth Amendment. That would violate the Fourth Amendment, yes, Your Honor. And all of the officers made the decision to do that. And so this is not just a question of it being a technical violation and the officers didn't know what the law was. This is officers with an entire body of clearly established law saying that the administrative inspection's exception is narrow and it may not be used as a pretext for criminal investigation, made the decision to conduct an unlawful entry and investigation. I think we have your position. Thank you, Your Honor. Ms. Jones. Yes, Your Honor. Your Honor, I just wanted to briefly address the notion that Mr. Brown never entered into the bargain with the city to have his Do you acknowledge that there was an intent to conduct a criminal investigation? Inspection or investigation, whichever. No, no, no. What did you say in the brief? Did you say criminal investigation? Your Honor, it would take me a minute to find specifically if I knew the page number that the co-counsel was speaking of. I don't necessarily dispute that it says investigation. But you agree that if they were going in there to do a criminal investigation, that's a different case altogether. Well, Your Honor, this case has been always hinged. Oh, no, no. Can you answer it yes or no? Well, I was going to say. If they were going in to do a criminal investigation, does that change the situation? Well, I think that the semantics of investigation versus inspection, yes, that would probably change some of the dialogue that we are having here. But I think that this case is hinged on, and we talked all about the administrative inspection, administrative inspection, administrative inspection. There was no intent to necessarily go in to do a search. There was no intent to necessarily go in to arrest someone. I'm talking about a criminal investigation. I understand that, Your Honor. And so to that end, that I think that an investigation that is pretextual, as you guys have already stated, versus Pretextual would mean that they thought they got these artists out there, but they're going in there to investigate a crime. Well, they didn't know if there was a crime being committed. They just knew that they needed to inspect the situation to determine what permits, if any, should or should not have been obtained at that time. And so this task force was to check licenses. They started out with a different nightclub that they were going to, and it was closed. So they then went, according to my reading of the record, I haven't read it, but my law clerk tells me that the record says they went to check licenses. So when I asked you the question, was there an intent to conduct a criminal investigation? According to my knowledge of what my law clerk says the record is, the intent was to conduct inspections for compliance with the license ordinances. And if Your Honor determines that that's a criminal investigation, then I submit to you that that's what their intent was. No, but you have to really try to answer the questions that are being asked. I understand. The officers began on a detail to conduct an inspection for licenses and administrative compliance, as Judge Anderson said, right? Yes. They then figured out that a number of the establishments they were going to inspect were closed. They were too late, right? Yes. And then one of them says, oh, I've heard or seen about this place. Let's go there. This was not on their planned inspection tour. No. Right? Yes. This was done because they ran out of places to inspect during their normal planned activities that evening, right? Yes, Your Honor. And so you have to analyze whatever happened at this establishment has to be analyzed individually because it wasn't like this was establishment number five on a list of ten and they were going to go see that place regardless because it was on their schedule. They only went to this place because they ran out of other places. They had shut down. They had already shut down. Is that understanding correct or not correct? Well, I was about to just clarify one issue. It wasn't that they sought out Mr. Brown's establishment. They happened upon it. Nobody mentioned it beforehand? I thought there was testimony from some of the officers that one of them remembered this establishment and had heard things about it, and so they went there. Yes, Your Honor, but they were already in that location checking. No, no, no. They weren't there. They were in the area, right? There's a difference between being someplace and going someplace. They were in a general area, whatever number of blocks wide. The places they were going to go see were closed. They couldn't conduct their planned inspections, right? Right. Adjacent businesses. But this was not directly adjacent. They moved, right? They had to go physically. Physically walked, yes, Your Honor. Yes, it wasn't adjacent. It wasn't next door. And it was because one of them said, oh, there's this other place, and I've heard that these things are going on, and that's why they went there, right? Yes, Your Honor, that's my understanding. What did they say about that place when they decided to go there? Why were they going to go there? It's my understanding that there was, from what I remember from the record, that there was an officer who had been to this location before and had spoken to Mr. Brown about his not having the permits to operate his club the way he was operating it. And that's what caught there. One of the officers, in fact, had been to this location before and had, excuse me, admonished Mr. Brown that he needed to get the permit. Did any of them mention going there for a criminal purpose, a criminal investigative purpose? Not to my knowledge, Your Honor. It was about license and permitting and business licenses and alcohol permits. So if we look at it, both of you are saying completely opposite things. So if we look at this record, there isn't going to be any testimony from any of the officers that they were going there to conduct a criminal investigation. The only testimony that is in the record right now is the deposition of Sergeant Burns, who was the leading officer at the time. No other officers were deposed in this case? No, Your Honor. No, it was just a 30B6 witness and Sergeant Burns, who was the leading investigative officer at the time.  What did he say about the purpose of the inspection, search, whatever we want to call it? It was to determine whether there was alcohol being served, whether there were licenses for that alcohol, whether there were business permits, whether there were permits for building permits, you know, the whole nine. All administrative? Arguably, yes. Not arguably. Well, I mean, that's what I'm doing here. I mean, it's just, yes, that's what they said. It's one thing to argue a position, and we all understand the difficulty of being a lawyer advocating for a client. We understand that. We've all been lawyers before, and we hope we haven't forgotten that. But when you're asked what a person testified to, that's not arguable. Someone testified to X, or he didn't testify to X. And my question is just, if he was the only deponent, did he say that they were going there for criminal investigative reasons, or did he say they were going there for administrative licensing issues? Administrative licensing issues. Okay. Thank you. I think we have your case. We'll be at recess until 9 in the morning. All rise. Thank you. All right. Great job.